[File No. 7100]

JOHN E. P. AASMUNDSTAD, Appellant, v. HILDA SJO-BERG, Respondent.

(34 NW2d 739)

Opinion filed Nov. 22, 1948. Rehearing denied Dec. 8, 1948

*Sinness & Duffy,* for appellant.

*F. T. Cuthbert* and *Obert C. Teigen,* for respondent.

CHRISTIANSON, Ch. J.   Plaintiff brought this action to enforce a certain oral agreement which he claims was entered into between the plaintiff and the defendant, when the plaintiff conveyed a certain tract of land in Ramsey County in this state to the defendant in November 1932, that the plaintiff should have the right to rent the land as long as he desired, and if and when he desired to do so he should have the right to repurchase the land by paying to the defendant the amount which she had invested therein.   The case was tried to the court without a jury. The court found that the agreement claimed had not been established and ordered judgment for a dismissal of the action.   Judgment was entered accordingly and the plaintiff has appealed and demanded a trial anew in this court.

On and prior to November 1, 1929, the plaintiff was the owner of a 320-acre tract of land in Ramsey County in this state. On November 1, 1929, the plaintiff and his wife executed and delivered to the defendant a note for $9,000 payable November 1, 1932, bearing interest at the rate of 6 per cent per annum. Such interest payments were represented by three interest coupons due respectively November 1, 1930, November 1, 1931, and November 1, 1932. The mortgage was duly recorded in the office of the Register of Deeds of the county. There is no question about the validity of the note and the mortgage.

On November 15, 1932, the plaintiff, who was then a widower, executed and delivered to the defendant a deed of general warranty conveying to her the premises described in the mortgage. The deed was recorded in the office of the Register of Deeds of Ramsey County, North Dakota, forthwith. On that same day the defendant executed a satisfaction of the mortgage and delivered the same together with the note secured by the mortgage to the plaintiff. On November 1, 1932, there was owing and unpaid upon such note and mortgage the principal amount of $9,000 and the interest payment of $540 which fell due November 1, 1932, and there were taxes against the premises amounting to $224.91, which the defendant paid, making a total amount on November 15, 1932, of $9,764.91. At the same time that the deed and satisfaction of mortgage were executed and delivered the plaintiff and defendant entered into a farm contract.

The farm contract was prepared on a printed blank in common use in this state and provided that Aasmundstad should farm the land in the season of farming for the years commencing November 15, 1932, and ending November 15, 1937. It provided that the defendant, Miss Sjoberg, should furnish the seed and that Aasmundstad should deliver to her one-half of all grain raised on the farm during the said farming seasons. At the time the farm contract was made the plaintiff was residing on the premises and he has continued to reside there since that time. The relations between the parties continued under the terms of the original contract. They made no new contract

but they made written endorsements on the contract signed by both the parties to the effect, (1) that the contract be extended to October 1, 1944, and (2) that the contract be extended to October 1, 1947. This controversy arises out of what transpired between the parties and as to what agreement was made between them at the time the deed was executed, the mortgage satisfied and the farm contract made.

The plaintiff claims that at the time the deed, and the satisfaction of the mortgage and the farm contract were executed and delivered "the defendant, in consideration of the execution of such deed, agreed to and with the plaintiff that he might rent the said premises as long as he desired, and that he should have the right to repurchase the said premises at any time upon repaying to the defendant the amount which she had invested in the premises at the time of such conveyance and which amount was not in excess of Ten Thousand Dollars."

The evidence discloses that in the fall of 1932 Aasmundstad was unable to pay the interest then due on his indebtedness to Miss Sjoberg. On his direct examination, he testified:

"Q. Now, in the fall of 1932, what happened?

A. Well, there was a poor price on grain that year and I went up to her and told her that I can't pay the interest this year and I said, 'You can go ahead and do what you want to do'; and a few days afterwards,—should I tell the whole story?

Q. Yes, go ahead.

A. A few days afterwards she came down to me and she said, 'I got to do something' because she had so much money in the farm she got to do something, she said she don't like to foreclose because it would cost lots of money and I said, 'I don't like that either', I said; and she said, 'If I get the deed you can stay here as long as you want to and you can buy it back any time you want to for the money I got in it."

On being asked what took place after the defendant and he had such conversation he answered, "Well, they put the deal to go in to see Bill Anderson to fix out the papers." He further testified that he had paid interest on the mortgage in prior years and that at the time he had this talk with the defendant there

was due on the mortgage $9,000 principal and one year's interest of $540. He testified that later he and Miss Sjoberg went to the office of William Anderson an attorney then practicing law in Devils Lake, who has since died. The evidence is not clear as to how this came about but apparently Miss Sjoberg had consulted Mr. Anderson and she and the plaintiff had arranged to meet at Mr. Anderson's office at some appointed time.

With respect to what took place at Anderson's office the plaintiff testified:

"Q. After you came into the office tell us then what took place?

A. Well, we told Anderson how we agreed out on the farm and he fixed up the deed and I signed the deed and he fixed up the contract and I told him what I wanted to put in the contract, I wanted him to put in that I farm it just the way I had been farming; and I told him that he should put in I was supposed to get it back when I had the money when I wanted to buy it back.

Q. Well now, when you said, 'We told Mr. Anderson what the conversation was out on the farm', did you tell him or did Miss Sjoberg tell him about the conversation that you related?

A. Well, Mr. Anderson knowed it before what was going on.

Q. Did you talk about it at the time?

A. Yes.

Q. Can you tell us, as nearly as possible, just what you said and what Miss Sjoberg said in regard to what the deal was supposed to be?

A. Well, there was said that,—I think they had it all fixed up before because there was not said anything except I said, 'When you come to the contract I want to farm the farm the way I been farming it'; and he was supposed to put in that I was supposed, to rent it as long as I wanted so I could get it back any time I wanted to for the money she had in it,—that is what he was supposed to put in the contract.

Q. That is what you told Mr. Anderson?

A. Yes.

. . . .

A. He was supposed to put in the contract that I was supposed to get it back, buy it back any time I wanted to and I told

Anderson and he said, 'I haven't got time now because I got a court case on hand'; he said, 'I got to go to the court', that was his words."

The defendant, Hilda Sjoberg, was called by the plaintiff for examination as an adverse party under the provisions of NDRC 1943, Sec 31–0202. On such examination she testified that after the plaintiff told her in the fall of 1932 that he was unable to pay the interest due on his mortgage she went to see Anderson an attorney at Devils Lake, and that Anderson suggested that she get a deed because she "had so much money in it and what was the use of putting out more expenses"; that subsequently she and the plaintiff met in Anderson's office in Devils Lake; that her brother brought her to town and accompanied her to Mr. Anderson's office and was present during the time the transactions between the plaintiff and defendant were had, and that so far as she can remember "Mr. Anderson did the talking." On being asked what took place she said:

"A. Well, he said that it was best since there was so much money invested that he should deed it to me and Mr. Aasmundstad agreed to that and then the deed was made and then the farm contract that was made; and Mr. Aasmundstad, the plaintiff, felt kind of bad and he said, 'Don't feel so bad because maybe some day she'll sell it back to you.' That is all I can remember that was said.

Q. Well now, Miss Sjoberg, that matter of Mr. Aasmundstad getting the land back was talked over before he signed the deed, wasn't it?

A. No, all I can remember was said afterwards, after it was all done, that he said he shouldn't feel too badly because some day she'll sell it back to you.

Q. As a matter of fact, Mr. Anderson had told you to see Mr. Aasmundstad and talk him into giving this deed, didn't he?

A. No, he never said anything like that to me."

Plaintiff's attorney then asked defendant if she recalled that she had a conversation with such attorney that fall in the office of one of her attorneys. She answered in the affirmative. She was then asked if she did not, in such conversation, tell plain-

tiff's attorney that attorney Anderson had said to her that "instead of foreclosing maybe we can talk Mr. Aasmundstad into getting or giving a deed." She answered that she did not remember exactly the words of the conversation. She was then further asked if she did not say in such conversation that she had not agreed to turn the land back to Mr. Aasmundstad but that Mr. Anderson had said to him that "he could get the land back at any time if he paid" the defendant what she had in it. She answered that he could not remember that.

William Sjoberg, defendant's brother, testified that he was present in Anderson's office at the time the deed and farm contract were executed. He stated that his sister had called him and asked him to take her to town because the roads were in bad condition; that he accompanied his sister to Anderson's office; that the plaintiff Aasmundstad was there, and that the plaintiff Aasmundstad, the defendant, Anderson the attorney, and William Sjoberg were the only persons present. That he did not hear it said, and that there was not any agreement, that Aasmunstad should have the right to repurchase the land upon payment to the defendant of "what she had in it," but that Anderson did say to Aasmundstad, "Don't feel so bad because she may give you a chance to buy this farm again sometime." That this statement by the attorney Anderson was made after the deed, the farm contract and the satisfaction of the mortgage had been executed. He further testified that apparently the plaintiff and the defendant knew about the proposed deal and that there must have been an understanding prior to the meeting either between the plaintiff and the defendant or between the plaintiff and the defendant's attorney Anderson as there was no discussion of terms and the parties apparently knew all about what was to be done. The witness, William Sjoberg, denied that he was present at the farm then occupied by the plaintiff some days prior to the meeting in Anderson's office, when it was arranged between the plaintiff and the defendant that they should go to Anderson's office and "fix up" the papers.

The undisputed evidence shows that at the time this transaction was had on November 15, 1932, the land was worth $15 per acre or $4,800 for the entire tract. That is the testimony

of the plaintiff himself as well as of the defendant's brother, William Sjoberg, given in response to questions propounded to them by the court.

The evidence shows that after November 15, 1932, the plaintiff continued to occupy and farm the land and each year the crop was divided between the parties in accordance with the terms of the farm contract. The evidence shows that both parties complied with the terms of the farm contract and apparently there was no disagreement between them in regard to any matter incident to the farming of the land.

With respect to expenditures for the maintenance and repair of the buildings on the premises since November 15, 1932, up to the trial of the action, the plaintiff testified:—

"A. I fixed the roof and I fixed the porch and put a new floor in the porch and fixed up the barn; she bought Fifteen Dollars worth of studding one year to fix up a little in the barn so it don't fall down and she painted the buildings here one year with some stuff; and I keep the inside of the house, I put in Twenty or Thirty or Forty Dollars every year to keep a home.

Q. In doing that will you say whether or not you relied upon her promise that you could get this farm back by paying her the amount she had in it?

A. I expected to get that back; yes, I been expecting to get the farm back."

Plaintiff testified that the first time after the deed was executed and delivered that he talked to the defendant about getting the land back was some nine years later, namely in 1941. In response to a question by his attorney to tell the whole story the plaintiff said:

"A. Should I say that at the time six years ago, as near as I can remember, a neighbor told me she is going to put me off, and that is six years ago, and I went up to her and I asked her and she said she don't know anything about it, that she didn't said she was going to put me off to anybody because, 'that is your home' she said, 'and you builded it up and it is your home and nobody else can have it'. And I said, 'We had better make

a new contract', and she come down home to my place and we wrote that on the contract six years ago.

Q. That was the time you wrote on there that the contract should be extended to 1944?

A. Yes; she come down to my home and we fixed it up out there ourselves, between ourselves, at my home and no witnesses or anything.

Q. Was there any talk at that time with reference to your getting the land back?

A. No, sir."

When asked what was the next time that he had a talk with her about getting the land back, he answered "three years ago." He stated that this conversation took place at his home. He testified:—

"A. Yes; I wanted a new contract then too because I didn't know how it was going to turn out; and she come down then too and we made that writing on the contract.

Q. That is the time you wrote on there that the contract was extended to 1947?

A. Yes, sir.

Q. And tell us what the conversation was you had at that time?

Mr. Cuthbert: (Defendant's attorney) All of the previous objections are renewed.

A. I asked her then if I couldn't get the farm back and she told me that she like to have it because it is a good price and good crops and she would like to have it for a few years more and then I thought probably we should go down and get a lawyer to have him fix out the contract more legal, you know I am not a lawyer, and she said, 'That is good enough; we don't have to do that.'

Q. Well, now, let's get that conversation a little bit more in detail. At that time you said you wanted to get the land back, you mean you were ready then to pay her for the land and have her transfer it to you?

A. Yes, sir.

Q. You told her that?

A. Yes, sir.

Q. And she told you—

A. She said she would like to have it because it was good crop and good price because she had been in the red so much she would like to get some money back,—that is just her words. She said she liked to have the farm longer because it was good prices and good crops; and I thought it better to get a lawyer to fix the contract to be legal and she said that was all right; she said, 'That is good enough between us that contract we signed up',—those were her words."

When asked what was the next time he talked to her about getting this land back he answered, "A year ago, I was up there and gave her the threshing bill. I asked her then if I couldn't get the farm back and she didn't say anything but Mrs. Albert Bryn said, 'The land is higher now', that is the only thing that was said up there at that time." When asked what was the next time he talked to her about getting the land back, he answered, "This fall", (the fall of 1947).

"I asked her this fall if I can't get the farm back and she said, 'How you going to do it?' she said; and I said, 'I give you Ten Thousand Dollars cash or if you wanted to be out the interest, some of it, you can do that too', I said; and then she didn't say anything but she said that she liked to keep it a few years more because the price is good and crops good and,—let's see, now, I don't get mixed up here,—and she said, 'If I can have it longer and get good price and good crop you might get it cheaper', she said, that is what she told me; and I said, 'O.K., we can do that, I can keep it a year or two or three more and we can make a contract when we go to Devils Lake and get it put in.' That is the last time this last year and she said, 'They tell me I can't do that', she said, she didn't say that herself but 'They tell me I can't do it', and I also told her and asked her if she was not her own boss."

He further testified that he had received a written notice dated October 1, 1947, signed by the defendant. The notice was introduced in evidence. In such notice the defendant notified the

plaintiff that the lease had terminated and that she did not intend to enter into any lease with him "relating to said premises".

The defendant, Hilda Sjoberg, was also questioned by plaintiff's attorney concerning conversations between her and the plaintiff relating to a repurchase of the land by the plaintiff. We quote from her testimony:

"Q. Mr. Aasmundstad did go to you this fall (1947) and wanted to get the land back, did he?

A. Yes.

Q. And he offered to pay you Ten Thousand Dollars to get it back, did he?

A. Yes.

Q. And had he about three years ago asked to get the land back and offered to pay you for it?

A. That was once but that was two years ago.

Q. What happened two years ago? What talk did you have about this?

A. He came over to Albert Bryn's and my sister was there too and she heard it; and his words were that, 'The kids want me to buy the farm back now and so I thought I would ask you', and so then he asked how much and that is the first that he ever mentioned, 'How much do you want for it?' So I said, 'I have to have at least what I have in it and then some because I have been in the red for so long'. That was the conversation.

Q. That you had to have what you had in it?

A. Yes, and then some because I had been in the red so long the first years; that is what I answered.

Q. Did you tell him at that time you wanted to keep the land for a few more years while crops and prices were good before turning it back to him?

A. No."

The defendant's sister, Mrs. Bryn, was called as a witness and testified that in August 1946 she was present and overheard a conversation between her sister the defendant and the plaintiff. We quote from her testimony:

"Q. What did the plaintiff say?

A. Oh, he said, 'My kids want me to buy the farm now so I thought I would ask you'. And then I went out and came back in again and he was talking about it and she was talking about it and she said, 'I have to have at least what I got in it and then some.'

Q. What did she say to him?

A. I went out.

Q. Now wait a minute; what did she say to him about what she wanted?

A. 'I have to have at least what I got in it and then some because I have been in the red so long.'

Q. You heard his conversation and you stepped out and when you came back you heard her say that?

A. Yes."

The plaintiff's son John was called as a witness by the plaintiff. He testified that he lived with his father on the farm and that he had overheard conversations between his father and the defendant with reference to his "father getting the farm back"; also that he had had a conversation with the defendant relating to this matter. He stated that "about three years ago" Miss Sjoberg came down to pay the thresh bill, that his father was not at home, and

"I asked her what if she wouldn't let us have our home back again because my dad had asked her a few days before that or sometime during the fall when we were threshing and she had refused then, so I thought I would take it upon myself to ask her myself, so and she said that she didn't like to do it now but she said, 'If I could have it a few more years and make some more money', she said, 'And if I make very much why you can even have it for less than I had in it at that time'. And the other time was this fall up in the yard at home and I was working on the combine out in the yard and she drove up and I forget what it was for and my dad came over and we were visiting there and he asked her if she would let us have it this fall because he said, 'You know that is what you promised to do, that you promised to let us have it back for the money you had in it at that time.' And she said, 'Yes, I know that but I would like

to keep it a few years now when prices and crops are good.'

The Court: Did your Dad say anything more about it then?

A. Well, she asked Dad how he wanted to do it, something along that line anyhow, and Dad told her he would give her Ten Thousand Dollars or 'If you want some money out on interest, if you want to make some money on it, I will do it too, but I want the farm back this fall as per your promise'. And she said, well, she didn't say 'yes', or 'no', but she said she didn't want to let it go when the crops and the prices were good."

He further testified that that fall, (1947), his father and the defendant, "arranged a date when they would go up together and see Bill about his, and see what he would have to say and I went along with my dad and that William Sjoberg denied that he ever heard anything about that but Hilda said that there had been some talk about that at that time; but she said that was a dumb deal anyway and never should have been made, that is the exact words she said."

Q. When you say that Bill denied ever having heard about this deal you are referring to the deal that your father could rent this farm for as long as he wanted to and get it back?

A. Yes, he said he couldn't remember it.

Q. That is the deal you are referring to?

A. Yes.

Q. That is the deal your father, Hilda and Bill talked about that day?

A. Yes, sir."

The plaintiff's attorney testified that he had a conversation with the defendant in the office of her attorney Mr. Teigen shortly before this action was commenced and that at that time he stated to the defendant's attorney (Teigen) rather than to the defendant, but that both the defendant and her said attorney were present, "that Mr. Aasmundstad claimed that Miss Sjoberg had agreed to turn this land back to him at any time upon him paying her what she had in it; and Miss Sjoberg said, in effect, that she had not made such a statement to Mr. Aasmundstad but that it was Mr. Anderson who had made that statement."

Defendant's counsel objected to all evidence that was offered by the plaintiff relating to the oral agreement which he claimed had been made between him and the defendant relating to the repurchase of the land. Defendant's counsel contended that even though all such evidence were admissible and the oral agreement were valid, if proven, that the plaintiff had failed to establish the existence of such agreement. The trial court laid to one side all questions as to the validity of the alleged oral contract and passed directly to the question whether the plaintiff had established the existence of the agreement which he claimed had been made. The court prepared and filed an extended memorandum decision wherein he summarized and analyzed the evidence and reached the conclusion that the plaintiff had failed to establish the oral agreement which he claimed had been made. In its findings the court said:

"The Court finds that without going into the question of the validity of such an oral contract had the same been made that the same is not sustained by the evidence but in that respect the plaintiff has failed to sustain his claim not only by clear and convincing testimony but that he has failed to sustain it by the preponderance of evidence."

According to the evidence the plaintiff initiated the negotiations which resulted in the conveyance of the land to the defendant on November 15, 1932. He testified that he went to see the defendant and told her that he could not pay the interest due that year and that he further told her "you can go ahead and do what you want to do". At that time he was indebted to the defendant in an amount about twice what the land was worth, and under the arrangement which was made the plaintiff received upon the delivery of the deed a satisfaction and discharge of his personal obligations to the defendant exceeding more than $9,500.00. He also received a farm contract entitling him to continue in possession of the land and to farm the same for a five year period. This contract contained no provision giving him any option to purchase the land. The contract was thereafter twice extended for additional periods and it was not until some nine years after the plaintiff delivered the deed

that he first approached the defendant and referred to repurchase of the land.

There is disagreement between the plaintiff and defendant as to what was said at the time the oral agreement was made. According to the defendant and her brother there was no agreement between the plaintiff and the defendant, nor was there any statement by the defendant, to the effect that the plaintiff might repurchase the premises at some future time, nor was anything said by anyone about a possible repurchase by the plaintiff until after the transaction had been fully completed and the deed and farm contract had been executed and then it was not the defendant but the defendant's attorney who made such statement; and that statement was not a promise or assurance that the plaintiff might repurchase the land at some future date but was merely a statement that maybe some day the defendant might sell the land to the plaintiff or give him a chance to buy it.

The trial court who heard and saw the parties and their witnesses was of the mind that the plaintiff had failed to establish that there was any understanding or agreement between the parties such as the plaintiff claimed. A consideration of all the evidence and the facts and circumstances in the case leads us to the same conclusion as that reached by the trial court.

The judgment appealed from is affirmed.

NUESSLE and BURKE, JJ., and THOM, JR., and GRONNA, District JJ., concur.

BURR and MORRIS, JJ., did not participate.